UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

SURESH PATHARE, SAMY ELGHAYESH,
NADER SOLIMAN, and GORDHAN PATEL,

        Plaintiffs,

    -v-                                 No.  06-Civ. 2202 (LTS)(DCF)

JOEL I. KLEIN, Chancellor of The New York
City Department of Education, and THE NEW
YORK CITY DEPARTMENT OF
EDUCATION,

        Defendants.

-----------------------------------------------------------x


**MEMORANDUM OPINION AND ORDER**

        Plaintiffs Suresh Pathare ("Pathare"), Samy Elghayesh ("Elghayesh"), Nader

Soliman ("Soliman") and Gordhan Patel ("Patel;" collectively, "Plaintiffs") bring this action

against Defendant Joel I. Klein ("Klein"), in his official capacity as Chancellor of the New York

City Department of Education ("DOE"), and the DOE (collectively, "Defendants"), alleging that

Defendants failed to promote Plaintiffs based on Plaintiffs' national origin, in violation of Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the New York State

Human Rights Law, New York Executive Law ("NYSEL") § 296 et seq., and the New York City

Human Rights Law ("NYCHRL"), Title 8 of the Administrative Code of the City of New York.

The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and

supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

Defendants' motion for summary judgment dismissing Plaintiffs' complaint in its entirety is now before the Court. Defendants' motion papers and Plaintiffs' opposition were both accompanied by a number of evidentiary submissions, and each party submitted a Statement pursuant to S.D.N.Y. Local Civil Rule 56.1. The Court has carefully considered all of the parties' submissions. For the following reasons, Defendants' motion for summary judgment is granted in its entirety.

BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiffs Pathare and Patel are United States citizens of Indian national origin. (Forman Decl.: Pathare Affid. ¶ 2; Patel Affid. ¶ 2.) Plaintiffs Elghayesh and Soliman are United States citizens of Egyptian national origin. (Forman Decl.: Elghayesh Affid.¶ 2; Soliman Affid. ¶ 2). All Plaintiffs were, at all relevant times, DOE employees, assigned to the DOE's Department of School Facilities ("DSF") (Klepfish Decl. Ex. E ¶ 5.), which is responsible for maintenance, repair and operation of DOE buildings. (Pls.' 56.1 Stmt. ¶ 2.)[1]

In 2004, DSF announced six openings for a newly created supervisory position, Regional Contract Manager ("RCM"). (Pls.' 56.1 Stmt. ¶¶ 4-5.) The job posting listed the minimum qualifications as follows:

> To qualify you must be in the civil service title of
> construction project manager, associate project manager,
> supervisor electrical installation and maintenance,

_____

[1]      Citations to the parties' Local Rule 56.1 Statements incorporate by reference the evidentiary materials referenced in those statements.

supervisor of mechanical installation and maintenance, engineer (civil, mechanical or electrical), senior estimator (construction, mechanical or electrical) or architect. In addition, all candidates must have a minimum of two (2) years supervisory experience and the following: effective communication and negotiation skills; experience in the contracting procedures of the Division of School Facilities; specific experience with PassPort Contracting and Work Order Modules; experience with Requirements Contracts and Job Order Contracting (JOC); and knowledge of Service Contracts procedures.

(Klepfish Decl. Ex. N.)  Elghayesh and Pathare applied for the RCM openings; Soliman and

Patel did not.  (Pls.' 56.1 Stmt. ¶¶ 8-9.)

Elghayesh and Pathare were among 26 applicants selected by DSF as meeting the

minimum qualifications for the RCM position.  (Pls.' 56.1 Stmt. at ¶ 11.)  These 26 were

interviewed individually by a panel of five DOE managers: Volkert Braren, Salvatore Spinale,

Michael Fiore, Robert Deschak and Alice Carman.  (Pls.' 56.1 Stmt. at ¶ 12.)  The panel asked

each candidate the following seven questions:

> 1. How you structure and/or organize your new position and department as Regional Contract Manager in this organization?
> 2. What steps would you take to insure accountability of the employees assigned to you?
> 3. How would you address problems with an employee related to productivity?
> 4. How would you address issues with quality of work of the employee and contractor?
> 5. What would you do if one of your inspectors believe there was hazardous material in the school and reported this belief to you?
> 6. What do you do if you suspect an impropriety regarding a contractor, inspector or custodian?
> 7. Describe for us the steps you would take to evaluate a proceed order in areas of which you are not familiar?

(Klepfish Decl. Ex. K.)  The panel assigned each candidate a score.  (Defs.' 56.1 Stmt. at ¶¶ 13-15.)  Based on these scores, of the 26 candidates, Pathare ranked eighteenth and Elghayesh ranked twenty-fifth.  (Id.)  According to the Defendants, the candidates were scored on the basis of their answers to the questions and on the interviewers' assessments of their appearance, enthusiasm, verbal skills, job-related knowledge, and supervisory capabilities.  (Defs.' 56.1 Stmt. ¶ 13.)  Plaintiffs argue that the interviewers could not have evaluated the candidates' job-related knowledge or supervisory capabilities based on the questions asked during the interview.  (Pls.' 56.1 Stmt. ¶ 13.)  Defendants proffer that the successful candidates were thereafter chosen through a discussion among the DSF managers, on the basis of their scores and a review of their backgrounds (relevant work experience and DOE work record) as set forth in their applications.  (Wilson Aff. ¶ 23; Braren Aff. ¶ 5.)  The "central requirement for the position," according to Defendants, "was broad general knowledge of the work performed at DSF and the supervisory skills necessary to manage those with specific experience in various disciplines involved in construction."  (Wilson Aff. ¶ 6.)  Plaintiffs assert that the successful candidates were pre-selected and that the interview process was a sham.  (Pathare Aff. ¶¶ 8-9; Elghayesh Aff. ¶¶ 9-10.)

DSF hired the three highest-scoring candidates and one of two candidates who tied for fourth place.  The remaining two positions were awarded to Richard Militello ("Militello"), who tied for seventh with four other candidates, and Paul Buccellato ("Buccellato"), who tied for thirteenth with one other candidate.  Of the six individuals hired, at

least five, including Militello and Buccellato, were Caucasians of American national origin.[2]  A

total of eight candidates were not hired despite having received interview scores equal to or

higher than Buccellato's.  Of those eight, five were not Caucasian-Americans.[3]  Specifically, one,

Naser Hamoudeh ("Hamoudeh"), was born in Egypt, and one, Raj Vohra ("Vohra"), was born in

India.  (Pls.' 56.1 Stmt. ¶¶ 16-18; Klepfish Decl. Ex. L; Defs.' 56.1 Stmt. ¶¶ 16-21.)

In March or April 2005, George Abraham, a DSF employee of Indian national

origin who had applied for the RCM openings, filed a complaint with the Equal Employment

Opportunity Commission ("EEOC").  Abraham alleged that he had been denied the RCM job and

other promotions because of his national origin and dark skin.  Abraham had ranked twenty-

fourth among the candidates interviewed for RCM.  (Forman Decl. Ex. C.)

Shortly after beginning work as an RCM, Buccellato left the position due to

illness.  DSF returned to the list and hired Hamoudeh.  Hamoudeh, the candidate of Egyptian

national origin, had received the same score as Militello. (Pls.' 56.1 Stmt. ¶ 22.)

In September 2005, Militello left his RCM position.  (Pls.' 56.1 Stmt. ¶ 25.)  This

---

[2]     The sixth, Mitchell Seminario is variously described as "Hispanic" or "Caucasian-American."  It is sufficient to note that Seminario was neither Indian nor Egyptian, and may have been Caucasian-American.  Throughout, Plaintiffs refer to the allegedly preferred group as "Caucasian-Americans," and at times refer to the Plaintiffs' background as "Asian" and "Middle Eastern."  However, Plaintiffs categorize their claim in terms of national origin, never race or ethnicity.  Insofar as Plaintiffs intend to allege racial or ethnic discrimination, their claims fail for the same reasons as their national origin claims (see "Discussion" section, infra).

[3]     By "Caucasian-American," Plaintiffs appear to mean Caucasians who were born in the United States.  See Pls.' 56.1 Stmt., passim (distinguishing successful candidates from "foreign born" candidates).

time, DSF posted the opening[4] and initiated a new interview process. (Pls.' 56.1 Stmt. ¶ 25.)

Plaintiffs Pathare, Elghayesh, Soliman and Patel all applied and were among 21 candidates

identified by DSF as possessing the minimum qualifications for the RCM position. (Defs.' 56.1

Stmt. ¶ 28.) These 21 were interviewed individually by a panel made up of Militello, Barry

Apple and Raji Natarajan, all managers at DOE. (Defs.' 56.1 Stmt. ¶¶ 29-30.) The panel asked

each candidate the following questions:

> 1. a. Describe how you spend a typical day in your current
>    title.
>    b. Describe how you would spend your day as a Regional
>    Contract Manager.
> 2. You are the Regional Contract Manager and you suspect
>    some impropriety on a particular project. What steps would
>    you take to address the situation?
> 3. You are the Regional Contract Manager and you are
>    unhappy with a contractor's performance. What advice
>    would you give your contract manager? Would you
>    intervene to protect the interests of the Department of
>    Education?
> 4. As Regional Contract Manager you will be the leader of
>    a group of managers with a variety of skill sets. What
>    experiences do you have that will ensure that you will be
>    able to lead this group? What training would you need?
> 5. Describe a difficult situation and the steps you took to
>    resolve it.

(Klepfish Decl. Ex. P.) The panel assigned each candidate a score. (Defs.' 56.1 Stmt. ¶ 31.)

Defendants allege that the scoring categories were the same as those used during the prior

interview process, and Plaintiffs again dispute the suitability of the questions for assessing the

candidates' job-related knowledge and supervisory capability. (Id.; Pls.' 56.1 Stmt. ¶ 31.) Based

on these interview scores, of the 21 candidates, Soliman ranked seventh, Elghayesh sixteenth,

---

[4]      This job posting was identical to the 2004 posting. (Pls.' 56.1 Stmt. ¶ 26.)

Pathare twentieth, and Patel twenty-first. (Klepfish Decl. Ex. Q.) DSF hired the candidate

ranked first, Parmand Ramphal ("Ramphal"), who was of the same national origin as Plaintiffs

Pathare and Patel. (Pls.' 56.1 Stmt. ¶¶ 33, 35.) Ramphal had applied for the initial RCM

openings and had been ranked fifteenth, tied with two other candidates in that process. (Klepfish

Decl. Ex. Q.)

      Plaintiffs assert that Ramphal, too, had been pre-selected, alleging that there had

been rumors that he would be the successful candidate and that, prior to the 2005 interviews, he

had been given training on computer programs used by the RCMs. (Soliman Aff. ¶ 9; Patel Aff.

¶ 16; Elghayesh Aff. ¶ 18.) Pathare, Elghayesh and Patel also testify that the interviewers in the

second round did not seem interested in their responses. (Elghayesh Aff. ¶¶ 6, 19; Soliman Aff.

¶ 8; Pathare Aff. ¶ 17.) Plaintiffs admit that none of the interviewers was heard to have made any

remarks evincing animus based on national origin. (Pls.' 56.1 Stmt. ¶ 37.)


DISCUSSION

<u>Summary Judgment Standard</u>

      Summary judgment shall be granted in favor of a moving party where the

"pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). In the summary judgment context, a fact is material "if it 'might

affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if

'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

<u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 248 (1986)).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (alteration in original)).  "[M]ere conclusory allegations, speculation or conjecture" will not provide a sufficient basis for a non-moving party to resist summary judgment.  Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  The evidence is viewed in the light most favorable to the nonmoving party and all reasonable inferences are drawn in its favor.  Rubens v. Mason, 527 F.3d 252 (2d Cir. 2008).

In the summary judgment context, claims brought under Title VII for discriminatory failure to promote are analyzed under the three-step burden shifting analysis the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Plaintiffs' claims under the NYSEL and the NYCHRL are subject to the same analysis.  Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).  Under McDonnell Douglas, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the job for which he applied; (3) he was denied the job; and (4) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII.  Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000).  The plaintiff's burden in putting forth a prima facie case of discrimination is "not onerous," Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and has been described as "de minimis," Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).  Once a plaintiff has made out a prima facie case, the burden shifts to the employer to offer some legitimate, nondiscriminatory reason for its actions.  McDonnell

Douglas, 411 U.S. at 802. "This burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000), and involves no credibility assessment of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). At this stage, the employer does not need to prove by a preponderance of the evidence that the rationale was not discriminatory, but must present a clear explanation for the action. Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989). If the employer meets its burden, the plaintiff is required to put forth evidence demonstrating the existence of a genuine issue of material fact as to whether the stated reasons are a pretext for prohibited discrimination. Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

Defendants move for summary judgment on the grounds that Plaintiffs have not made out a prima facie case and that, even if they have, Plaintiffs cannot show that Defendants' stated legitimate business reasons are a pretext for discrimination.

The First Six RCM Openings

Plaintiffs Elghayesh and Pathare have met their burden of establishing a prima facie case for failure to promote based on national-origin discrimination, with regard to the initial RCM openings. It is undisputed that they are members of protected classes based on their national origins, and that they applied for a position for which they were qualified, but were not hired. The undisputed fact that DSF selected lower-ranked applicants who were not of Plaintiffs' national origins ahead of applicants of the Plaintiffs' national origins is sufficient at this initial stage to constitute a circumstance giving rise to an inference of discrimination. Plaintiffs Soliman and Patel however, did not apply for the RCM position until the second posting, and

therefore cannot make out a prima facie case with regard to the initial process.  See, e.g.,

Petrosino v. Bell Atlantic, 385 F.3d 210, 226-227 (2d Cir. 2004).

Defendants have also successfully satisfied their burden with regard to the

McDonnell Douglas analysis.  Defendants have articulated legitimate business reasons for failing

to promote Elghayesh and Pathare.  Defendants maintain that all candidates were scored on their

interview performance, based on their responses to the questions as well as more subjective

factors such as appearance, enthusiasm and verbal skills, and were ultimately selected based on a

combination of the rankings and consideration of their backgrounds as detailed in their

applications.  Supervisory and management, rather than specific technical, skills were, according

to Defendants, the central consideration in determining qualification for the position.  Subjective

criteria are legitimate bases for promotion decisions, as long as they are explained, as they are

here, in clear and specific terms.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 104

(2d Cir. 2001).  All six positions were filled with candidates who were ranked ahead of

Elghayesh and Pathare.  As to why some candidates, including members of the purportedly

preferred and disfavored groups, were passed over in favor of Militello and Buccellato,

Defendants cite Militello's excellent job performance and Buccellato's recent experience in a

supervisory position similar to RCM.  (Defs.' 56.1 Stmt. ¶¶ 17-19.)

Thus, the Court must look to the third step of the McDonnell Douglas analysis,

whether Plaintiffs have raised a genuine issue as to whether Defendants' stated reasons for

denying them the sought-after position are a pretext for national-origin discrimination, in

determining whether summary judgment in Defendants' favor is warranted.  Plaintiffs argue that

DSF's goal in filling the RCM openings was not to choose the best candidates, but to select

Caucasian-Americans. They allege that Defendants' rationale is a pretext for discrimination based on national origin because (1) the individuals hired were not qualified to be RCMs; (2) the interview process was, at best, an irregular and inadequate method for ranking candidates, and, at worst, a sham; and (3) Defendants' proffered reasons for bypassing higher-ranked candidates in favor of Militello and Buccellato were false.

Based on their interpretation of the description of RCM job duties, Plaintiffs argue that an RCM should have a background in mechanical, structural/civil, and electrical engineering.[5] Plaintiffs note that many of the candidates who were hired had a background in only one of those areas. Plaintiffs also point out that, in his deposition, Barry Apple, one of the interviewers in the second round, interpreted the RCM job description to indicate that an RCM should have a "background in all those school [sic] sets which means an understanding of mechanical, electrical and civil-type engineering work." However, it is undisputed that the posted job requirements did not include particularized experience or education in any engineering discipline.

Plaintiffs do not argue that the successful candidates lacked the minimum qualifications as articulated and applied by DSF.[6] Rather, they challenge the adequacy of the

---

[5]   Pointing to a passage in the "duties and responsibilities" section of the RCM job posting that listed "Ability to perform all the tasks assigned to a Contract Manager when necessary," Plaintiffs argue that engineering expertise was a necessity because "[t]he work of the Contract Managers included engineering duties." (Pls.' 56.1 Stmt. ¶¶ 6-7.)

[6]   Plaintiffs make an unsupported allegation that RCMs, whom Plaintiffs claim are unqualified because they lack technical expertise, have contributed to the disrepair of public schools. Even if there were specific evidence that the RCMs have performed poorly, it would not create a genuine issue of fact as to whether hiring those individuals in the first instance was motivated by discrimination.

qualifications themselves.  Setting minimum qualifications for a job title is typically a matter left to an employer's discretion, not one for judicial involvement.  See Howley v. Town of Stratford, 217 F.3d at 151 ("The district judge stated that the Town was entitled to set its own criteria for the assistant-chief position.  Indeed it is. . . ."); Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 313 (2d Cir. 1997) ("[W]e do not second-guess an employer's hiring standards. . . .").  Moreover, Plaintiffs have not demonstrated that Defendants' processes deviated from the stated standards or were otherwise irregular.  Cf. Id.  Plaintiffs have failed to frame a genuine issue of material fact as to the successful RCM candidates' qualifications and thus have failed to raise a genuine issue as to whether Defendants' explanation for hiring them is a pretext for national-origin discrimination.

As to the interview process, Plaintiffs argue that the questions posed to the candidates could not possibly have shed light on their job-related knowledge or supervisory capabilities, and that an inference of national-origin discrimination is warranted because the only remaining bases for scoring were subjective criteria: appearance, enthusiasm and verbal skills. This argument is contradicted by the undisputed facts.  Although the interviewers' questions may not have been designed to elicit technical engineering information, as Plaintiffs would seem to have preferred, the interviewers did ask hypothetical questions dealing directly with RCM job functions and general supervisory scenarios.  These questions were clearly capable of eliciting responses that would allow the interviewers to assess a candidate's job-related knowledge and supervisory capabilities.  Plaintiffs' disagreement with Defendants' choice of questions is insufficient to raise a genuine issue as to whether Defendants' proffered explanation that it based its hiring decisions on the interview process is pretextual.

Plaintiffs have proffered no other evidence raising a genuine factual issue as to Defendants' stated reasons for hiring Militello and Buccellato. The record does not show that the candidates who were skipped in favor of those two – notably those of the protected classes in question, Hamoudeh and Vohra – had the supervisory experience or job performance record that Defendants cite as reasons for selecting Militello and Buccellato. Plaintiffs proffer no explanation for why, if Defendants' proffered rationale is a pretext for national-origin discrimination, Caucasian-Americans were among those passed over. In light of these undisputed facts, a rational fact-finder could not conclude that Defendants' stated reasons for hiring Militello and Buccellato are a pretext for national-origin discrimination. Cf. Howley, 217 F.3d 141 at 153.

The Subsequent RCM Openings

Plaintiffs are correct in urging that the initial and subsequent hiring processes for the RCM positions should be examined collectively. A jury would view the case in light of the totality of the circumstances, and the Court's review on summary judgment should mirror that process. Byrnie, 243 F.3d at 102. However, looking to the RCM hirings as a single unit does not itself create a genuine issue as to whether Defendants' stated reasons are a pretext for national-origin discrimination. In fact, the similarity of the two processes and the consistency of Defendants' rationale undercuts Plaintiffs' claim of procedural irregularity. Plaintiffs' inability to create a genuine issue as to the hiring of the first six RCMs thus largely disposes of any claims

based on the hiring of Hamoudeh and Ramphal.[7]

Hamoudeh, who was chosen in the second round without a new interview process, was among the highest-ranked candidates on the original ranking list. Hamoudeh was a member of the protected group, and Plaintiffs do not proffer any evidence that his hiring was improper or unusual. All four Plaintiffs did apply for the final opening, which resulted in the hiring of Ramphal after a nearly identical interview, ranking and selection process,[8] with one significant difference: Ramphal achieved the top score, so there was no skipping on the list. Plaintiffs argue in a conclusory fashion that Ramphal had been pre-selected for the job, and that his top score on the interview was fixed in advance. Even if this were sufficient to satisfy the initial inference of discrimination required for a prima facie case, absent any direct or circumstantial evidence that national origin was considered, it is insufficient to allow a rational fact-finder to conclude that the hiring was based on national-origin discrimination, particularly when the person selected is of the same national origin as two of the persons who challenge their own rejection as discriminatory. See Howley, 217 F.3d at 152-53 (expressing doubt as to whether evidence of pretext alone would be sufficient to create a genuine issue as to whether pretext was for

---

[7]    The fact that Hamoudeh and Ramphal were later hired is not necessarily indicative of bias in the initial hiring process. Hamoudeh was never declared unsuitable in the initial process – in fact he was highly ranked. He was simply passed over in favor of a preferred candidate; Defendants have articulated a specific rationale for the preference. Plaintiff argues that Hamoudeh and Ramphal were hired in response to Abraham's EEOC complaint, but proffers no evidence that DSF considered that complaint in making personnel decisions. Nor, in light of the record concerning Defendants' hiring process, is Plaintiffs' implicit argument that the hiring of persons of Plaintiffs' national origins in the second and third round was a cover-up – prompted by the Abraham complaint – for discrimination in the first round, anything other than speculative.

[8]    The interview questions, though worded differently, were substantially similar.

discrimination). Even if a rational inference of pre-selection could be drawn in connection with Ramphal's hiring, Plaintiffs offer no evidence to connect that inference to any rational basis for discerning a genuine issue as to pretext for national-origin discrimination with regard to the initial process, or the RCM hirings as a whole.[9]

Plaintiffs also argue that Soliman and Patel were better qualified for the position than Ramphal, based on superior experience and educational background – including degrees – in engineering. As explained above, educational degrees were not a requirement for the job, nor are they mentioned anywhere in the posting. Plaintiffs' arguments that the posted requirements were insufficient, or that they themselves were superior candidates based on the criteria they argue should have been used, are, as shown above, insufficient to raise a genuine issue of material fact as to national-origin discrimination.

---

[9] Plaintiffs' unattributed hearsay proffers in their affidavits that they had heard rumors, prior to the interviews, that the six individuals who were hired had been pre-selected, are similarly insufficient to create a genuine issue as to pretext for illegal discrimination.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is hereby granted in its entirety. The Clerk of Court is respectfully requested to terminate Docket Entry No. 23, enter judgment in Defendants' favor, and close this case.


SO ORDERED.

Dated:      New York, New York
            September 12, 2008

LAURA TAYLOR SWAIN
United States District Judge